IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,050

In the Matter of DANIEL VINCENT SAVILLE,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed March 6, 2020. Two-year suspension.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause, and *Penny R. Moylan*, Deputy Disciplinary Administrator, was with him on the brief for the petitioner.

*Michael J. Studtmann*, of Law Office of Michael J. Studtmann, P.A., of Wichita, argued the cause and was on the brief for respondent.

PER CURIAM:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Daniel Vincent Saville, of Wichita, an attorney admitted to the practice of law in Kansas in 1993.

On July 25, 2018, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent timely filed an answer to the complaint on August 17, 2018. The respondent filed a probation plan on September 10, 2018, and an amended probation plan on October 1, 2018. Respondent personally appeared and was represented by counsel at the complaint hearing before a panel of the Kansas Board for Discipline of Attorneys, which was conducted on September 24-25, 2018. During the hearing, respondent stipulated that he violated KRPC 1.7(a)(2) (2019 Kan. S. Ct. R. 308) (conflict of interest).

1

At the conclusion of the hearing, the panel determined that respondent had violated KRPC 1.7(a)(2) (2019 Kan. S. Ct. R. 308) (conflict of interest); 1.8(e) (2019 Kan. S. Ct. R. 315) (providing financial assistance to client); 3.4(c) (2019 Kan. S. Ct. R. 353) (fairness to opposing party and counsel); and 8.4(d) (2019 Kan. S. Ct. R. 387) (engaging in conduct prejudicial to the administration of justice). The panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report, the relevant portions of which are set forth below.

"*Stipulation*

"6.     During the hearing, the respondent stipulated that he violated KRPC 1.7(a)(2) (conflict of interest).

"*Findings of Fact*

. . . .

"9.     The respondent practices criminal law in Wichita[,] Kansas. At some point prior to 2006, the respondent defended A.R.'s father in a driving under the influence of alcohol case. Subsequently, when A.R. was charged with driving under the influence of alcohol, her father recommended that she hire the respondent. Following her father's advice, on June 15, 2006, A.R. hired the respondent to represent her. Through the respondent's efforts, the driving under the influence of alcohol case against A.R. was dismissed.

"10.     During spring, 2007, A.R. contacted the respondent again because she needed legal representation in a paternity case. Initially, the respondent referred her to another lawyer for representation in the paternity case. However, because the other lawyer was unable to assist A.R., the respondent represented A.R. in the paternity case.

2

"11.     About that same time, the respondent and A.R. commenced a sexual relationship. Whether the sexual relationship began prior to when the respondent agreed to represent A.R. in the paternity case is unclear from the record. According to the respondent, the relationship began between February, 2007, and May, 2007. The sexual relationship between A.R. and the respondent continued, on-and-off, until August, 2015. During their sexual relationship, A.R. allowed the respondent to take nude photographs and videos of her.

"12.     Following the representation of A.R. in the paternity case and continuing through April, 2013, the respondent represented A.R. in approximately ten separate legal matters. While representing A.R. in multiple legal matters and during the course of their personal and sexual relationship, the respondent provided A.R. with financial assistance on a number of different occasions.

"13.     On September 14, 2007, the respondent commenced representation of A.R. in Butler County case number 07-TR-2403. The respondent concluded the representation on November 6, 2007.

"14.     On October 9, 2007, the respondent began representing A.R. in Wichita Municipal Court case number 07-TM-52446. That representation concluded on February 27, 2008.

"15.     On August 29, 2008, the respondent entered his appearance on behalf of A.R. in Butler County case number 08-TR-1914. While this case was pending, the respondent purchased A.R. a Honda automobile. The respondent completed that representation on November 5, 2008.

"16.     On November 10, 2008, the respondent began his representation of A.R. in Wichita Municipal Court case 08-TM-51320. In December, 2008, while the case was pending, the respondent bought A.R. another automobile, a Pontiac Grand Prix. The respondent concluded that representation on April 20, 2009.

3

"17.     On May 5, 2009, through May 21, 2009, the respondent represented A.R. in Sedgwick County case number 09-LM-8078. During this representation, the respondent paid A.R.'s moving expenses.

"18.     On August 21, 2009, A.R. filed a protection from stalking case against the respondent. On September 3, 2009, A.R. failed to appear for a hearing and the court dismissed the case.

"19.     On February 2, 2010, the respondent entered his appearance on behalf of A.R. in Sedgwick County case number 09-TR-21456. The respondent's representation in this Sedgwick County case was complete on August 2, 2010.

"20.     On September 7, 2010, the respondent began representing A.R. in Wichita Municipal Court case number 10-CM-2858. The respondent continued to represent A.R. in this case until February 6, 2012. While this case was pending, on July 10, 2011, on behalf of A.R., the respondent paid A.R.'s landlord $1,000. However, two weeks later, the respondent discovered that A.R.'s landlord gave A.R. the $1,000. After learning that the landlord gave A.R. the money, the respondent demanded that A.R. return the money to him or threatened that he would file suit against her.

"21.     Shortly thereafter, on August 9, 2011, A.R. filed a second protection from stalking case against the respondent. Despite the protection from stalking case, the respondent did not withdraw from his representation of A.R. in the Wichita Municipal Court case number 10-CM-2858. A.R. failed to appear for a hearing and on September 22, 2011, the court dismissed the protection from stalking case.

"22.     On August 30, 2011, the respondent sued A.R. for the return of the $1,000 in Sedgwick County case number 11-SC-747. On September 29, 2011, the court entered judgment for the respondent against A.R. Thereafter, on October 26, 2011, the court denied A.R.'s motion to set aside the judgment. The respondent continued to represent A.R. in the Wichita Municipal Court case number 10-CM-2858 while the respondent's suit against A.R. was pending.

4

"23.     On June 6, 2012, the respondent entered his appearance on behalf of A.R. in Wichita Municipal Court case number 12-CM-990. The respondent concluded this representation on August 27, 2012.

"24.     On July 16, 2012, A.R. was charged with aggravated assault, a felony, in Butler County District Court case number 12-CR-358. A.R. requested that the respondent enter his appearance on her behalf. The respondent required A.R. to enter into a contract with him prior to when he entered his appearance. The contract included the following:

'I [A.R.] am writing this contract which Danny Saville and myself have discussed prior to this in order for him Danny Saville to represent me in criminal case # 12CR358 in Butler Co Kansas. The charge is level four person felony, agg Battery alleged against [J.Y.S.]. Danny has agreed to represent me in this matter for NO MONIES, pro bono, free—under these conditions which he stated and made clear to me ([A.R.]). Condition #1 is that I do not move back in with my boyfriend [M.S.] (Because Danny and He have had issues over me in the past), not at all while this case is pending and/or final. If I keep my word that I will not get back together and move back in with [M.S.], Danny Saville has stated he will/would represent me in case 12CR358 and not pull out or withdraw under any other conditions other than the two listed. Danny has stated that if I do break our agreement by moving back in with [M.S.] that I pay him for his time spent on my case 12CR358. He has also stated that if I do break our agreement I would have to pay for the things like— discovery, pictures taken @ scene of crime accident incodent [*sic*], any and all statements made—time spent on case—DVS 150 hr legal asst. 75 hr by any and all witnesses involved in this case 12CR358, pictures of me, my face, condition and bruses [*sic*]. Danny will not under any circumstances destroy these things (items) and if I break our agreement he will let me have those things for a fee (his fee) of $150 per hour and as of 7-22-12 @ 7:49 pm he will keep track of time for billing purposes in the event it is needed for payment upon withdrawal 12CR358—taking pics and interviewing witnesses also phone calls and entry sent to Butler Co Court house [*sic*]. I also have to make myself avail[able] for consults

5

and appointments however Danny will see to it that I'm given 24 hrs notice on all appointments and consults. In the event that I break this contract by moving back in with [M.S.] and/or not making myself avail[able] for all reasonable appointments—Danny may withdraw as my attorney on case #12CR358. Danny Saville has read over and signed this contract with me on the 22nd day of July 2012. Love you Danny and Thank you so much—I appreciate your time and help. Written by [A.R.] as directed by Daniel V. Saville.'

The agreement was signed by A.R. and the respondent.

"25.     Pursuant to his agreement with A.R., on July 27, 2012, the respondent entered his appearance on behalf of A.R. in Butler County District Court case 12-CR-358. The respondent also entered his appearance on behalf of A.R. in Butler County District Court case number 11-CR-358 on an allegation of a probation violation.

"26.     The respondent paid the costs associated with A.R.'s $25,000 surety bond in the aggravated battery case. Additionally during the same time frame, the respondent paid for costs associated with A.R.'s medical care. Specifically, on August 13, 2012, the respondent provided A.R. with a check to pay for her medication. Instead of using the check to pay for her medication, A.R. changed the payee and used the money to pay for eyeglasses. After the respondent learned that A.R. did not use the money to pay for medication and that she changed the payee, on August 16, 2012, the respondent informed law enforcement of A.R.'s actions. The respondent withdrew from his representation of A.R. in 12-CR-358 on August 30, 2012. On September 18, 2012, A.R. was charged with forgery in Butler County case number 12-CR-505. The respondent did not represent A.R. in the forgery case.

"27.     On April 8, 2013, the respondent represented A.R. in Andover City Court case number 12-39357. The respondent completed the representation on May 20, 2013.

"28.     In August, 2015, the respondent accused A.R. of stealing a number of rings and electronic storage devices containing thousands of photographs. The respondent

6

reported the theft to the police. During the investigation, A.R. admitted to taking the electronic storage devices, placing them in the respondent's microwave to destroy the images, and disposing [of] the electronic storage devices by placing them in the respondent's trash. A.R. destroyed the devices because they contained nude photographs and videos of her. Thereafter, felony theft charges were filed against A.R. in Sedgwick County District Court case number 16-CR-85, for theft of the rings and electronic storage devices.

"29.     On January 30, 2017, the court conducted a hearing on pretrial motions in the theft case. At that time, the judge entered an order sequestering witnesses for the upcoming jury trial.

"30.     On February 27, 2017, the court commenced a jury trial in the theft case.

"31.     The hearing panel received conflicting evidence regarding the respondent's knowledge of the sequestration order. The respondent testified he was not aware of the order. Jason Roach, Assistant District Attorney, testified that he specifically informed the respondent of this order. Further, the respondent's practice of law is limited to defending clients in traffic and criminal court. Based on all of the evidence before the hearing panel, the hearing panel accepts Mr. Roach's testimony on this subject and finds that the respondent's testimony in this regard lacks merit. The hearing panel finds that on February 27, 2017, in the jury room, Mr. Roach informed the respondent that the court ordered the sequestration of the witnesses.

"32.     Testimony began on February 28, 2017. J.W., an individual who was present at the respondent's house when A.R. allegedly stole the items was listed as a witness for the prosecution. The respondent was also listed as a witness for the State.

"33.     During the trial, J.W. testified that she took the bag of rings from the respondent's house and gave them to her then-boyfriend. J.W. also testified that her then-boyfriend informed her that he returned the bag of rings to the respondent. Because J.W. incriminated herself, the judge granted the prosecutor's request for recess. The judge directed that J.W. be sequestered in the courthouse library and that the prosecutor and

7

defense attorney meet with him in chambers. On the record, the judge stated that no one should speak to J.W.

"34.    Mr. Roach informed the respondent of J.W.'s testimony and his belief that the case must be dismissed. The respondent became upset. Mr. Roach suggested that he go get his supervisor so they could discuss the options available.

"35.    Again, the hearing panel received conflicting evidence as to whether Mr. Roach informed the respondent during the recess that J.W. was sequestered. Again, the hearing panel accepts Mr. Roach's testimony on this subject and finds that the respondent's testimony in this regard lacks merit. The hearing panel finds that Mr. Roach told the respondent that J.W. was sequestered in the courthouse library and directed the respondent to remain in the break room until he returned with his supervisor.

"36.    The respondent did not remain in the break room. The respondent went with another [person] to the courthouse library and spoke with J.W. regarding her testimony. The respondent recorded the conversation with J.W.

"37.    Mr. Roach and his supervisor went to the break room to talk with the respondent. The break room door was locked. After court personnel unlocked the break room door, Mr. Roach and his supervisor found the room to be empty. Mr. Roach and his supervisor discovered the respondent speaking to J.W. in the courthouse library. Because the respondent violated the sequestration order, J.W. informed the court that the respondent was discovered speaking with J.W. in the courthouse library.

"38.    In open court, the court expressed his concern to the respondent about his violation of the sequestration order. Because J.W. testified that she took the rings, the case against A.R. was dismissed.

"*Conclusions of Law*

"39.    Based upon the respondent's stipulation and the above findings of fact, the hearing panel concludes as a matter of law that the respondent violated Rules

8

1.7(a)(2) (conflict of interest), 1.8(e) (conflict of interest), 3.4(c) (fairness to opposing party and counsel), and 8.4(d) (professional misconduct), as detailed below.

"Rule 1.7

"40.     The respondent stipulated that he violated KRPC 1.7(a)(2). That rule provides:

'(a)     Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

(2)     there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.'

Even if there is a conflict of interest under KRPC 1.7(a)(2), a lawyer may continue to represent a client if the lawyer satisfies the provi[sions] of KRPC 1.7(b):

'(b)     Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)     the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)     the representation is not prohibited by law;

(3)     the representation does not involve the assertion of a claim by one client against another client represented by the

9

lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.'

"41. The respondent had a concurrent conflict of interest under KRPC 1.7(a)(2) in representing A.R. based on his own personal interest. The respondent had a personal and sexual relationship with A.R. which began after the respondent represented A.R. in the driving under the influence of alcohol case and close in time to his representation of A.R. in the paternity action. The respondent did not (and in the hearing panel's opinion, because of the basis of the conflict in this case, could not) take the steps necessary under KRPC 1.7(b) to continue the representation.

"42. Additionally, after the respondent reported to law enforcement that A.R. forged the check he gave her for medication, the respondent's conflict of interest under KRPC 1.7(a)(2) was exacerbated.

"43. Furthermore, evidence that A.R. filed a protection from stalking case against the respondent in 2009 and again in 2011, is yet more evidence of the respondent's significant conflict of interest in representing A.R.

"44. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.7(a)(2).

"Rule 1.8

"45. Lawyers are prohibited from providing 'financial assistance to a client in connection with pending or contemplated litigation' with two limited exceptions:

'(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

10

'(2)     a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.'

"46.     The respondent provided financial assistance to A.R. 'in connection with pending or contemplated litigation' when he paid her bond in the Butler County District Court case number 12-CR-358. The payment of A.R.'s bond does not fall within the limited exceptions mentioned above. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.8(e) when he paid A.R.'s bond.

"47.     In addition to the payment of A.R.'s bond, the record before the hearing panel is replete with references to the respondent providing financial assistance to A.R. The respondent purchased A.R. two cars, he paid her moving expenses, he paid for some of her medications, he paid for some of her other medical bills, and he repeatedly offered to give her money. Ms. Moylan argued that each instance when the respondent provided financial assistance to A.R. when litigation was pending is a violation of KRPC 1.8(e). The hearing panel disagrees. The hearing panel concludes that there must be some relationship between the financial assistance and the representation. If a relationship between the financial assistance and the representation is not required, then the language 'in connection with pending or contemplated litigation' would be unnecessary.

"48.     Ms. Moylan relied on *In re Delaney*, 300 Kan. 1090 (2014), *In re Mandlebaum*, 304 Kan. 67 (2016), and *In re Odo*, 304 Kan. 844 (2016) in arguing that all financial assistance provided by the respondent violated KRPC 1.8(e). Those three cases can be distinguished from the case at hand.

"49.     First, in *Delaney*, the respondent provided the financial assistance to his client because the respondent's lack of diligence injured his client financially. From a review of the opinion, it appears that Mr. Delaney was attempting to right a wrong that he caused in the representation. In this case, there is no evidence that the respondent was attempting to right a financial wrong he caused in his representation of A.R.

"50.     In *Mandlebaum* and *Odo*, the respondents provided financial assistance to clients in anticipation that the representation would result in a financial settlement in the clients' favor. Those circumstances are not present in this case. The respondent's

11

purchase of the two cars for A.R., his payment of her moving expenses, and his payment of some of her medication and other medical bills was not done 'in connection with pending or contemplated litigation.' The respondent's representation of A.R. was limited to a paternity action and defending A.R. in traffic and criminal court, with no anticipation that the representation would result in a financial settlement in A.R.'s favor unlike the situations in *Mandlebaum* and *Odo*. The hearing panel concludes that the respondent provided the financial assistance to perpetuate the personal and sexual relationship with A.R.

"51.    While the hearing panel concludes that the only financial assistance the respondent provided in violation of KRPC 1.8(e) was his payment of the bond as described above, the hearing panel would caution that providing financial assistance to a client during the period of representation, even if the financial assistance is not 'in connection with pending or contemplated litigation' is not the best practice and creates an environment which is fraught with potential conflicts of interest.

"52.    Because the respondent had sex with his client, the disciplinary administrator's office alleged a violation of KRPC 1.8(k). KRPC 1.8(k) provides:

> 'A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced.'

However, at the beginning of the second day of hearing on the formal complaint, Ms. Moylan moved to dismiss this rule violation. The hearing panel granted Ms. Moylan's motion to dismiss this allegation. Further, during her closing argument, Ms. Moylan argued that the respondent's conduct in beginning a sexual relationship with a client after the representation commenced was also covered by KRPC 1.7(a)(2).

"53.    Because references to the sexual nature of the respondent's relationship with A.R. are made throughout the record, the hearing panel is compelled to include a limited discussion of this rule and an explanation for Ms. Moylan's request to dismiss that allegation.

12

"54.     It is clear to the hearing panel that the respondent had sex with his client. And, it is also clear to the hearing panel that the respondent's sexual relationship with A.R. did not commence until after he represented her in the driving under the influence of alcohol case and after A.R. sought the respondent's assistance with the paternity case. Thus, on its face, it appears that KRPC 1.8(k) applies in this case. However, the Kansas Supreme Court adopted KRPC 1.8(k), effective July 1, 2007. The respondent's sexual relationship with A.R. started sometime between February 2007, and May 2007; clearly before this rule was effective. Accordingly, the hearing panel concludes that KRPC 1.8(k) was not in effect at the time the respondent's sexual relationship with A.R. began.

"Rule 3.4

"55.     Clearly, lawyers must comply with court orders. Specifically, KRPC 3.4(c) provides:  ['][a] lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.' In this case, Mr. Roach told the respondent on February 27, 2016, that the court ordered the witnesses sequestered. Additionally, during his conversation with the respondent when the trial was at recess due to J.W.'s testimony, Mr. Roach told the respondent that J.W. was sequestered in the library and that he needed to remain in the break room.

"56.     Contrary to the sequestration order and Mr. Roach's instructions, the respondent contacted J.W. in the courthouse library and discussed her testimony. Because the respondent violated the court's order sequestering the witnesses, the hearing panel concludes that the respondent violated KRPC 3.4(c).

"Rule 8.4(d)

"57.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' Rule 8.4(d). When the respondent violated the sequestration order and spoke with J.W. during trial about her trial testimony, the respondent engaged in conduct that was prejudicial to the administration of justice. Interfering with a witness' testimony or attempting to convince a witness to change her

13

testimony significantly prejudices justice. The hearing panel concludes that the respondent's violation of the court's sequestration order also violated Rule 8.4(d).

"*American Bar Association
Standards for Imposing Lawyer Sanctions*

"58.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"59.     *Duty Violated*. The respondent violated his duty to his client to refrain from engaging in conflicts of interest. The respondent also violated his duty to the public to maintain his personal integrity. Finally, the respondent violated his duty to the legal profession and the legal system to refrain from engaging in conduct that is prejudicial to the administration of justice.

"60.     *Mental State*. The respondent knew that his personal and sexual relationship with A.R. created a conflict of interest. Also, the respondent knowingly provided financial assistance to A.R. in connection with litigation. Finally, the respondent made contact with J.W. when he knew of the court's sequestration order. The hearing panel concludes that the respondent's misconduct was done knowingly and intentionally.

"61.     *Injury*. As a result of the respondent's misconduct, the respondent caused potential injury to his client and the legal system. The respondent caused actual injury to the legal profession.

"Aggravating and Mitigating Factors

"62.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its

14

recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

        a.      *Prior Disciplinary Offenses*. The respondent has been previously disciplined on two occasions. In 1996, the disciplinary administrator informally admonished the respondent. In 2011, the respondent participated in the attorney diversion program for having violated KRPC 8.4(b) based on his convictions of two counts of possession of drug paraphernalia.

        b.      *Selfish Motive*. The respondent's motivation in this case was his personal and sexual relationship with A.R. The hearing panel concludes that the respondent's misconduct was motivated by selfishness.

        c.      *A Pattern of Misconduct*. The respondent's conflicts of interest spanned many years. Thus, the hearing panel concludes that the respondent engaged in a pattern of misconduct.

        d.      *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.7(a)(2) (conflict of interest), KRPC 1.8(e) (conflict of interest), KRPC 3.4(c) (fairness to opposing party and counsel), and KRPC 8.4(d) [(]professional misconduct). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

        e.      *Vulnerability of Victim*. Based on the personal and sexual relationship between the respondent and A.R., the hearing panel concludes that A.R. was vulnerable to the respondent's misconduct.

        f.      *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1993. At the time the misconduct began, the respondent had been practicing law for approximately 14 years.

"63.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its

recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.　　　*Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. The respondent suffers from personal and emotional problems. The respondent has a history of drug addiction. The respondent actively used illegal drugs during the early years of his relationship with A.R. Shortly before the hearing on the formal complaint, the respondent began therapy. At that time, he had participated in three sessions with the therapist. In therapy, the respondent has been working to overcome dysfunctional behavior. However, the relationship between the respondent's personal problems and the misconduct appears to be remote. Further, the benefits which the respondent may obtain from therapy have not yet been realized as the respondent is new to therapy.

b.　　　*The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His Acknowledgment of the Transgressions.* The respondent fully cooperated with the disciplinary process. Additionally, the respondent stipulated that his personal and sexual relationship with a client resulted in a violation of KRPC 1.7(a)(2). Finally, the respondent made it clear that he understands the problems associated with developing a personal and sexual relationship with a client. While the respondent did not acknowledge the wrongful nature of contacting J.W. when she was sequestered, the hearing panel concludes that defending that allegation does not negate his cooperation.

c.　　　*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

16

d. *Remorse*. During his testimony, the respondent apologized for 'his part' in the misconduct.

e. *Remoteness of Prior Offenses.* The misconduct which gave rise to the respondent's discipline in 1996 is remote in time and the misconduct which gave rise to the respondent's participation in the attorney diversion program in 2011 is remote in character to the misconduct in this case.

"64. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'6.22 Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.

'6.31 Disbarment is generally appropriate when a lawyer:

(a) intentionally tampers with a witness and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding; . . .

'6.32 Suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding.'

17

"65.    Ms. Moylan recommended that the respondent's license to practice law be suspended for a period of one year.

"66.    Counsel for the respondent recommended that the respondent's plan of probation be adopted and that he be allowed to continue to practice law, subject to the probation terms.

"*Consideration of Probation*

"67.    When a respondent requests probation, the hearing panel is required to consider Kan. Sup. Ct. R. 211(g)(3), which provides:

'The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)    the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)    the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii)    the misconduct can be corrected by probation; and

18

       (iv)      placing the Respondent on probation is in the best

                   interests of the legal profession and the citizens of the

                   State of Kansas.'

"68.     While the respondent developed a workable plan, provided the plan to the hearing panel and Ms. Moylan 14 days prior to the hearing, and put the plan into place, probation is not appropriate in this case. The respondent's plan is not substantial nor detailed. The misconduct, in this case, cannot be corrected by probation. Finally, placing the respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas.

"*Recommendation of the Hearing Panel*

"69.     Based on the record before it, the hearing panel unanimously recommends that the respondent's license to practice law be suspended for a period of six months. The hearing panel further recommends that the respondent be required to undergo a reinstatement hearing under Rule 219 prior to the consideration of reinstatement of his license to practice law.

"70.     The hearing panel also recommends that the Supreme Court order the respondent to pay the costs of this action in an amount to be certified by the disciplinary administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the hearing panel, and the arguments of the parties and determines whether violations of the KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2019 Kan. S. Ct. R. 257). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth

19

of the facts asserted is highly probable.'"'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint to which he filed an answer; he was given adequate notice of the hearing before the panel at which he appeared and was represented by counsel; and he was given adequate notice of the hearing before this court at which he appeared and was represented by counsel. After the panel's final hearing report, respondent filed exceptions, as well as a brief, claiming that there was not clear and convincing evidence to support the panel's finding that he had violated Rules 3.4(c) and 8.4(d).

Before discussing Respondent's exceptions, we pause to acknowledge that the Disciplinary Administrator took the position before both the panel and this court that it is a per se violation of Rule 1.8(e) for an attorney to pay a client's criminal bond. Furthermore, it is unclear from his filed exceptions and brief whether Respondent actually challenged this position or the panel's findings of a Rule 1.8(e) violation. Certainly, the issue was not adequately briefed by Respondent. *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008) ("[T]he general rule [is] that an issue not briefed on appeal is deemed waived or abandoned."); *In re Coggs*, 270 Kan. 381, 396, 14 P.3d 1123 (2000) ("We, therefore, decline to consider the two issues raised but not briefed.").

Then, at oral argument, Respondent explicitly agreed with the Disciplinary Administrator's interpretation of Rule 1.8(e) and conceded that Respondent's payment of his client's criminal bond violated the rule. We note here that this court has never held that a lawyer paying a client's bond or bail is a per se violation of Rule 1.8(e). Indeed, there is contrary authority suggesting that in certain circumstances, such conduct may be appropriate. See American Bar Association Formal Opinion 04-432 (January 14, 2004) ("A lawyer may post, or arrange for the posting of, a bond to secure the release from custody of a client whom the lawyer represents in the matter with respect to which the

client has been detained, but only in those rare circumstances in which there is no significant risk that her representation of the client will be materially limited by her personal interest in recovering the amount advanced."); Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility 2017-2018, at 508 (commenting on model rule 1.8(e) and concluding that "[w]hile bail is an expense of litigation, the Rules do not give the lawyer carte blanche authority to advance bail funds to the client").

Given, however, the Respondent's concession at oral argument that he violated Rule 1.8(e) by paying his client's criminal bond; the Respondent's failure to challenge the panel's findings on this point in his filed exceptions and brief; and the particular facts and circumstances of this case, we have no difficulty concluding that Respondent did in fact violate Rule 1.8(e). As such, we need not rule on the correctness of the Disciplinary Administrator's position that Rule 1.8(e) creates an absolute bar to an attorney posting bail for a client in every circumstance.

Respondent does challenge the evidence supporting the panel's findings that he violated Rule 3.4(c) and 8.4(d). These rule violations arose out of the same conduct. The crucial factual finding below was that Respondent knowingly violated a court's sequestration order when he spoke with witness J.W. in the courthouse library. The panel found this conduct violated both rules. Respondent challenges the evidence supporting this finding of fact. He does not claim that such conduct, if proved by clear and convincing evidence, would not violate the rules.

Respondent advances two basic arguments to claim the evidence is insufficient to support the factual finding that he knowingly violated a sequestration order. First, he asserts the evidence in the record demonstrates that he did not know the witness was sequestered. Second, he claims the evidence shows that he believed the case had been dismissed at the time he spoke to J.W., so any sequestration order would have expired.

21

We will adopt the factual findings of a disciplinary panel "where amply sustained by the evidence, but not where it is against the clear weight of the evidence." *In re Angst*, 278 Kan. 500, 504, 102 P.3d 388 (2004). If a respondent fails to take exceptions to the panel's findings, they are deemed admitted. "On the other hand, when exception is taken, this court must examine the record and determine if a rational factfinder could have found the determination to be highly probable." *In re Swanson*, 288 Kan. 185, 187, 200 P.3d 1205 (2009). "When the panel's findings relate to matters about which there was conflicting testimony, this court recognizes that the panel, as the trier of fact, had the opportunity to observe the witnesses and evaluate their demeanor. Therefore, we do not reweigh the evidence or pass on credibility of witnesses." *In re Lober*, 276 Kan. 633, 637, 78 P.3d 442 (2003).

The record contains significant evidence that Respondent knew there was a sequestration order. The prosecutor testified he discussed the sequestration of J.W. with Respondent multiple times. The prosecutor recounted that prior to jury selection, he was preparing the Respondent and another witness for trial and he explained the pretrial sequestration order to both witnesses at that time. The prosecutor detailed that he distinguished between appropriate conversation with other witnesses—such as the weather or sports—and impermissible topics, including testimony.

In video captured by Respondent in the library, a senior attorney in the prosecutor's office stated several times that the prosecutor told Respondent to stay away from J.W. Although Respondent protested, the prosecutor emphasized "she is sequestered. I said those words." The prosecutor's letter to the office of the Disciplinary Administrator consistently recounted these events, stating that the prosecutor "expressly told [Saville] that [J.W.] was sequestered in the library and that he was to remain in the breakroom."

The same video clearly demonstrates that Respondent knew the case was ongoing when he spoke with J.W. The video's transcript includes this exchange between Respondent and the senior prosecutor, Tom Weilert:

> "MR. SAVILLE: . . . If you dismiss the case now, jeopardy is attached, you can't bring it again. And—and that—
>
> "MR. WEILERT: If we proceed with it now she's going to be found not guilty.
>
> "MR. SAVILLE: Yeah, but I—I haven't had a chance to testify. You—this can be—you can clear that up with the facts. I mean, she took the stuff."

This conversation shows that Respondent knew the case had not been dismissed. He hoped it could be salvaged with his testimony and was concerned about possible double jeopardy issues if it were to be dismissed.

Taking all of this into consideration, it is clear to us the panel simply did not credit Respondent's claims that he either didn't know J.W. was sequestered or believed the case had been dismissed. The evidence in the record is not only sufficient but also clear and convincing to support the panel's credibility judgments and findings of fact.

The Final Hearing Report recommended we suspend Respondent's license to practice law for a six-month period, with a Supreme Court Rule 219 reinstatement hearing to follow. See 2019 Kan. S. Ct. R. 270. Before us, the Disciplinary Administrator recommended a one-year suspension with a reinstatement hearing. Respondent requested a period of probation.

These recommendations are just that—recommendations. See *In re Biscanin*, 305 Kan. 1212, 1229, 390 P.3d 886 (2017). We further consider that despite the

overwhelming evidence, Respondent has refused to accept responsibility for the violations under KRPC 3.4(c) and 8.4(d).

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Daniel Vincent Saville be and he is hereby disciplined by suspension from the practice of law in the state of Kansas for a period of two years, effective the date of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2019 Kan. S. Ct. R. 240) for violations of KRPC 1.7(a)(2), 1.8(e), 3.4(c), and 8.4(d). Should the respondent seek reinstatement, he must undergo a reinstatement hearing under Supreme Court Rule 219 (2019 Kan. S. Ct. R. 270). A minority of the Court would have accepted the Disciplinary Administrator's recommendation of a one-year suspension followed by a Rule 219 hearing.

IT IS FURTHER ORDERED that the Respondent shall comply with Supreme Court Rule 218 (2019 Kan. S. Ct. R. 268).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 121,050 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.